**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **DR. AMY ANDERTON,** | **§** | |
| **Plaintiff,** | **§** | |
| | **§** | |
| **v.** | **§** | **CIVIL ACTION NO. 3:23-cv-02596-G** |
| | **§** | |
| **DALLAS INDEPENDENT SCHOOL** | **§** | |
| **DISTRICT,** | **§** | |
| **Defendant.** | **§** | |

**PLAINTIFF'S FIRST AMENDED COMPLAINT**

NOW COMES DR. AMY ANDERTON, Plaintiff in the above-styled and numbered cause ("Plaintiff"), and files this, her First Amended Complaint, complaining of the Dallas Independent School District, ("DISD"), Defendant herein. Plaintiff would respectfully show the Court the following:

## I. PARTIES

1.1 Plaintiff Dr. Amy Anderton is an individual residing in Dallas County, Texas. She has been employed by DISD for the past nine years. She is a sixty-year-old heterosexual Caucasian woman.

1.2 Defendant Dallas Independent School District is a public school district organized and existing pursuant to the laws of the State of Texas. Defendant is a "state actor" within the meaning of applicable law and the actions complained of herein comprise "state action" and were taken under color of law. Defendant has been served and has appeared through counsel in this action.

## II. JURISDICTION AND VENUE

2.1 This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367; the Age Discrimination in Employment Act of 1967 (29 U.S.C. §§ 621 *et. seq*.), the provisions of

42 U.S.C. §§ 1981, 1983, and 1988; Title VII of the Civil Rights Act of 1964, (42 U.S.C. § 2000e *et seq.*), as well as under the 14th Amendment to the United States Constitution.

2.2. Venue is proper in this district and division pursuant to 28 U.S.C. § 1391(b), as all or part of Plaintiff's claims accrued in Dallas County, Texas, which is within this District and Division.

## III. FACTUAL BACKGROUND

3.1. Plaintiff was an employee of DISD for nine years, ending on or about December 12, 2023. Her position was Curriculum Director for World Languages. She oversaw teachers of languages other than English, and implemented new programs and new courses for the twelve foreign languages taught in DISD. With the team she supervised, she also supported students and teachers in obtaining seals of biliteracy and bilingualism, which officially recognize when a student has reached certain levels of competence in more than one language.

3.2 Beginning in early 2023, Plaintiff was subject to discrimination based on her race (Caucasian), her age (60), and her sexual orientation (heterosexual). Plaintiff previously reported to an executive director, and since July 2023 has reported to one of DISD's two Deputy Chiefs of Academic Services. The executive director who previously supervised Plaintiff; both Deputy Chiefs of Academic Services, including the one who supervised Plaintiff at the time she was terminated; and the Chief of Academic Services who supervises both Deputy Chiefs, are all younger than Plaintiff, and are either LGBTQI and/or African-American. Plaintiff is older than virtually every director within DISD.

3.3 The discrimination Plaintiff endured up to September 2023 included the following: she and her team were excluded from meetings, moved into inferior and inconvenient offices, denied necessary furniture, and lied to about orders for furniture. DISD created and allowed a

hostile work environment, intended to force Plaintiff to retire or quit. At sixty years of age, she is at least five years older than all of her recent supervisors (and their supervisors), who favor younger employees. Plaintiff's supervisor treated her with condescension, permitted African-American staff to target Plaintiff for ill-treatment, and treated younger employees, African-American employees, and LGBTQI employees more favorably than Plaintiff. Plaintiff planned to continue working in the DISD for at least five more years. With five more years in the district, Plaintiff would more than double the monthly retirement payment for which she will be eligible at age 65.

3.4 In late September 2023, Defendant DISD informed Plaintiff that she was being put on administrative leave. On November 17, 2023, Plaintiff was informed by telephone that the process of termination had begun, based on unspecified alleged policy violations. She was informed that she would receive an email officially informing her of her termination, after which she would have fifteen days to file a grievance. Plaintiff was terminated and filed her grievance. She has had a Level II hearing, at which her grievance was denied.

3.5 Also in the telephone call of November 17, 2023, Plaintiff was told that she would be contacted to set up a meeting to discuss the termination process (at which she would not be allowed to be represented by counsel). Plaintiff was never contacted to set up such meeting.

3.6 After making several requests, Plaintiff finally – at the end of November – received a memo dated November 7, 2023, setting forth the results of an investigation by DISD's Professional Standards Office, which appears to be DISD's pretextual reason for her termination.

3.7 DISD's investigation purported to determine that in visiting campuses in the district, and looking in on foreign language classes or students who might benefit from programs offered by Plaintiff's team, Plaintiff had improperly met with two students. The two students were brothers, non-native speakers of English, and new to the district, having previously been

homeschooled. Plaintiff knew them because she is a close family friend of their parents. She was concerned about them on a personal level, but she also had reasons related to her district position for visiting their campuses. In the alternative, (because Defendant DISD has accused her of determining the students' schedules "in part for a personal purpose," and for using "her District assignment" to locate and meet with the students "for non-district purposes"), she was acting out of concern for the welfare of the two students and her interactions with them were protected speech.

3.8 DISD has further made a report to SBEC, endangering Plaintiff's teaching credentials. As a result, the publicly available status of Plaintiff's teaching certificate shows that she is under investigation, a designation that makes employment in education exceedingly unlikely, if not impossible.

3.9 DISD's grounds for terminating Plaintiff's job and teaching credentials are pretextual; in reality, Plaintiff has been terminated based on her age, race, and/or sexual orientation. DISD has taken its actions against Plaintiff, according to its letter informing her of her termination, pursuant to its policies. That is, DISD relies on its own policies "FL(Legal and Local) and DH(Exhibit)" in terminating Dr. Anderton.

## IV. CAUSES OF ACTION

***Alternative Pleadings***. To the extent necessary, each of the claims set forth below is pleaded in the alternative.

### A. Federal and State Law Discrimination Claims

4.1 All factual allegations set forth above or below are incorporated herein by this reference. DISD put Dr. Anderton on leave and conducted an "investigation" after Dr. Anderton spoke with two students, in late September 2023. These two students were brothers, and they were

the sons of friends of Dr. Anderton. One of the students was in a Spanish class within Dr. Anderton's scope of supervision, and one of them was at an elementary school where Dr. Anderton had reason to speak with the principal. At the time, the students were in foster care, but in mid-November they were returned to their parents after a baseless CPS case was dismissed.

4.2 DISD used these conversations with the two students as a pretext to terminate Dr. Anderton. In reality, Dr. Anderton was terminated because DISD favors younger administrators, and DISD and/or Dr. Anderton's supervisor wanted to replace her with someone younger, or simply wanted to get rid of her. Alternatively, their actions were the result of racial discrimination or sex discrimination, based on Dr. Anderton's sexual orientation.

<u>Exclusion from meetings and information</u>

4.3 Even before she was put on leave, Dr. Anderton's former boss, Ms. Gaynor, excluded Dr. Anderton from emails and left her out of meetings at which all other Directors reporting to Ms. Gaynor were included. Even some who did not report to Ms. Gaynor were included. This caused Dr. Anderton several times to be late on assignments, or very rushed at the last minute when she was told at the last minute of a deadline regarding which her younger colleagues had been notified. All of the directors and other employees who received emails and notices from Ms. Gaynor which excluded Dr. Anderton were younger than Dr. Anderton.

<u>Evidence of Pretext</u>

4.4 On October 27, 2023, during the time Dr. Anderton was on leave, but before the investigation had concluded, Dr. Anderton's supervisor posted a photo of the three employees who reported to Dr. Anderton, on social media, calling it "Team of Three," as if Dr. Anderton did not lead that team. All persons in the photograph, including Dr. Hill, are younger than Dr. Anderton:




4.5 This demonstrates that Dr. Anderton's supervisor had already made the decision that Dr. Anderton would be terminated.

<u>Dr. Anderton was pushed off the edge of DISD's age chart</u>

4.6 The three people who reported to Dr. Anderton were younger than Dr. Anderton. The chief to whom Dr. Anderton's boss reported (Ms. Gaylord), and Dr. Anderon's boss (Dr. Hill) were younger than Dr. Anderton. That is just Dr. Anderton's immediate area.

4.7 Dr. Anderton worked in Academic Services. In Academic Services, there were 26 people (including Dr. Anderton) with the title of Director I or higher. All were younger than Dr. Anderton, except a JROTC colonel, and upon information and belief, he is employed by the federal government, not DISD.

4.8 At the time Dr. Anderton was terminated, DISD had 171 employees with the title of Director I or above (one step below Dr. Anderton, who was a Director II). These include all such directors who do not teach or work in the schools, and also including executive directors over principals, the financial department, the construction department, the police and security department, the racial equity department, the technology department, HR, the academic and transformation department, and the operations department-such as food services and transportation and HVAC, etc. Of those 171, only 17 were older than Dr. Anderton. Virtually none of these older employees interact directly with students, or get involved in student schedules and placement the way Dr. Anderton did.

Race Discrimination

4.9 Dr Anderton, who is Caucasian, has been treated less favorably than African-American colleagues, up to and including being terminated. The races of the DISD employees involved are as follows:

Dr. Anderton – Caucasian

Dr. Anderton’s boss, Dr. Elena Hill – African-American

Dr. Anderton’s former boss, Arlena Gaynor – African-American

Dr. Anderton’s former boss’s boss, Michele Broughton – African-American

Dr. Anderson’s colleague, Dr. Lisa Whitaker – African-American

4.10 During 2023, Dr. Anderton's team, and many others, were moved to a new building. During the move, Dr. Anderton was continually thwarted and misled by an African-American employee of DISD (Dr. Lisa Whitaker), who had a major role in overseeing the move. At the beginning of the move, Dr. Anderton's boss was Arlena Gaynor, also African-American, and Ms. Gaynor's boss was Michele Broughton, also African-American. Ms. Gaynor and Ms. Broughton permitted Dr. Whitaker to separate Dr. Anderton's team, refuse reasonable requests by Dr. Anderton, and to harass and make Dr. Anderton's job as difficult as possible.

4.11 When Dr. Elena Hill became Dr. Anderton's boss in July 2023, she refused to do anything to help Dr. Anderton counter Dr. Whitaker's actions, and in fact, ordered Dr. Anderton to apologize to Dr. Whitaker. Further, in her first week as Dr. Anderton's boss, Dr. Hill wrote Dr. Anderton up for emailing a chief over operations, as part of Dr. Anderton's efforts to get answers regarding her team's move that Dr. Whitaker refused to provide. Dr. Anderton did not realize she was not allowed to contact the operations chief, because she thought he was at the director level. Dr. Hill and Dr. Whitaker are both African-American. Dr. Hill's favoritism toward Dr. Whitaker, including disciplining Dr. Anderton for complaining to the operations chief about Dr. Whitaker, were discrimination against Dr. Anderton based on race.

4.12 As set forth above, both before and during the move, Dr. Anderton's former boss, Ms. Gaynor, excluded Dr. Anderton from emails and left her out of meetings at which all other Directors reporting to Ms. Gaynor were included. Even some who did not report to Ms. Gaynor were included. This caused Dr. Anderton several times to be late on assignments, or very rushed at the last minute when she was told at the last minute of a deadline regarding which her colleagues had been notified. The only other director who was left out of these emails and meeting notices

was a white woman, Barbara Johnson. If Dr. Anderton was not excluded in this way based on her age, it was based on her race, or a combination of her race and her age.

DISD's Basis for Termination was Pretextual

4.13 Further, if Dr. Anderton's termination was not based on her age, it was based on her race, or a combination of her age and her race. As set forth above, during the time Dr. Anderton was on leave, but before the investigation had concluded, Dr. Anderton's supervisor posted a photo of the three employees who reported to Dr. Anderton, on social media, calling it "Team of Three," as if Dr. Anderton did not lead that team. (see photo above). This demonstrates that Dr. Anderton's supervisor had already made the decision that Dr. Anderton would be terminated, before the investigation concluded. The races of those involved are as follows:

Dr. Anderton's boss, Dr. Hill is African-American.

None of the three people who reported to Dr. Anderton were Caucasian.

Dr. Anderton is Caucasian.

4.14 Finally, Sexual Orientation Discrimination. Dr. Anderton has been targeted for discrimination because she is heterosexual. Dr. Anderton is not gay. Dr. Anderton's boss, and her boss's boss, are gay.

4.15 If Dr. Anderton's boss's favoritism toward Dr. Whitaker, and Dr. Anderton's termination, were not based on her age and/or race, she believes they were based on her sexual orientation, or a combination of her age, race, and/or sexual orientation. Based on same, Plaintiff sues for discrimination based on her age, her race, and her sexual orientation.

4.16 Plaintiff timely filed a charge of discrimination in employment against DISD, in administrative proceedings with the Equal Employment Opportunity Commission, in which she asserted that she was treated in a disparate and discriminatory manner due to her race (Caucasian),

her age (sixty), and her sexual orientation (heterosexual), in violation of federal law, including Title VII of the 1964 Civil Rights Act, and the ADEA (Age Discrimination in Employment Act of 1967).

4.17 On February 23, 2024, Plaintiff received a letter from the EEOC, attached hereto as Exhibit A, that the Department of Justice will issue the notice of right to sue directly to her. Plaintiff has thus exhausted her administrative remedies with respect to her state and federal law discrimination claims, and sues for discrimination by DISD under Title VII and the ADEA. The conduct of DISD in creating a hostile work environment, favoring African-American employees, employees under 55, and employees who are LGBTQI over Plaintiff, and terminating Plaintiff, has caused Plaintiff damages for which she now sues.

**B. Violation of 42 U.S.C. § 1983 – Denial of Procedural Due Process**

4.18 All factual allegations set forth above or below are incorporated herein by this reference. The Fourteenth Amendment prohibits Defendant from depriving Plaintiff of her property interest in her employment, her rights under the First Amendment, or any other rights, privileges, and/or immunities secured under the U.S. Constitution without due process; further, 42 U.S.C. § 1983 provides a mechanism for her to seek remedies for such deprivation.

4.19 Defendant's wrongful conduct, as described herein, was a result of actions taken by its Board and/or its supervisor, or to those delegated authority by the ultimate policy makers. Defendant's policies, as written and/or as applied to Plaintiff, including without limitation "FL(Legal and Local) and DH(Exhibit)," resulted in deprivation of Plaintiff's property interest in her employment and her liberty interests in free speech and freedom from discrimination, without due process. Such wrongful conduct was caused by policymakers of Defendant, including its Superintendent, and such conduct was sanctioned, through action and/or inaction, by Defendant's

Board of Trustees, the Superintendent, and others, all singularly or collectively acting as policymakers for Defendant in this case.

4.20 As set forth above, Defendant deprived and/or improperly diminished Plaintiff's right to procedural and substantive due process, as secured by the Fifth and Fourteenth Amendments to the United States Constitution. Plaintiff's claims under § 1983 do not require any exhaustion of administrative remedies.

4.21 Defendant violated Plaintiff's right to procedural due process by informing her she would be terminated based on conduct she had no notice was a violation of policy, and certainly that she had no notice was a terminable offense. During the same timeframe that Plaintiff dropped in on the campuses of the two students in question, the Chief of Academic Services told the deputy chiefs and all directors, including Plaintiff, that they needed to be out of their offices, in the schools, providing services and being a touch point for the campuses they served. These campus visits did not require appointments.

4.22 Moreover, Plaintiff believed that she was permitted to speak with students generally, having done so many times in the past. She had no notice that she was forbidden to speak with these particular students, so long as she preserved their privacy. She had no prior notice that she might be terminated for this conduct, and DISD's termination of her without such prior notice is a denial of due process, in violation of the Fourteenth Amendment.

4.23 Plaintiff had a reasonable expectation that her employment would not be terminated for the reasons set forth in the investigative report she was given. The investigative report contains factual inaccuracies, which she was not permitted to refute prior to her termination. She was given no opportunity to defend against such allegations by those making decisions regarding her employment. The only procedure afforded Plaintiff was an after-the-fact "hearing" at which the

burden was on her to show that DISD's actions were unlawful, unconstitutional, or arbitrary and capricious. The internal hearing officer for DISD, unsurprisingly, ruled against her.

4.24 Additionally or alternatively, Defendant violated Plaintiff's right to procedural due process by failing and/or refusing to provide Plaintiff with a full due process hearing prior to her termination, depriving and/or improperly diminishing (1) Plaintiff's protected property interest in her ongoing employment, her performance thereof, and her rights thereunder, and (2) Plaintiff's First Amendment rights, her liberty interest in freedom of speech and freedom from discrimination. Defendant impinged, deprived, and/or improperly diminished all of Plaintiff's foregoing protected interest and freedoms without due process of law.

4.25 In the alternative, Defendant's actions and/or conduct further constitute a deprivation of due process, as each and all of the above acts and/or omissions were made in recognition of, as a part of, and/or as a result of the policies, practices, and/or customs of Defendant, created by or through policymakers and/or persons to whom Defendant effectively delegated policymaking authority.

**C. Violation of 42 U.S.C. § 1983 – Denial of Substantive Due Process**

4.26 Additionally, Plaintiff asserts a claim against Defendant for violation of substantive due process for Defendant's arbitrary, capricious, unreasonable, and/or irrational actions taken against her, as set forth in detail above. Additionally or alternatively, Plaintiff has been deprived of her protected and fundamental property rights without due process of law in an arbitrary, capricious, unreasonable, and/or irrational manner. She had no notice that her actions, which were in keeping with her job responsibilities to go out to campuses, and interact with students -- promoting both the goals of her world languages programs and the welfare of the students in

questions -- would be treated as violations of DISD policy. The decisions made to terminate her were made without notice or hearing, and were made without reference to any guiding principles.

4.27 Defendant's conduct constitutes violations of Plaintiff's rights to procedural and substantive due process. As a result of Defendant's conduct, Plaintiff has been injured and/or damaged. Accordingly, Plaintiff seeks to recover her damages from Defendant, including, without limitation, loss of income and benefits, mental anguish and nominal damages, and to recover any and all other remedies afforded and/or available under law and/or in equity, including but not limited to injunctive relief, equitable relief, and her attorneys' fees and costs.

**D. Violation of 42 U.S.C. § 1983 – First Amendment - Free Speech**

4.28 All factual allegations set forth above are incorporated herein by this reference. As set forth above, Plaintiff exercised her protected right to free speech by speaking with two students. Although Plaintiff was performing her job duties at the time she spoke to the students, Defendant DISD has accused her of determining the students' schedules "in part for a personal purpose," and for using "her District assignment" to locate and meet with the students "for non district purposes." If Defendant contends that Plaintiff's contact with the two students, both of whom are children of her close friends, was outside the performance of her job duties, then such contact was protected First Amendment speech.

4.29 Based on Defendant's allegation that her conversations with the two students were "for non district purposes," Defendant's termination of Plaintiff based on such contact violates her First Amendment rights, infringing her free speech. Plaintiff spoke with these students in an effort to protect their welfare, and from concern for their well-being. The students had been wrongfully removed from their home, and without in any way interfering with CPS or disclosing information about the students' locations or the foster parents, Plaintiff acted to help the students and their

family. CPS overreach, and the difficulties faced by immigrants such as the family in question, are matters of public concern.

4.30 Defendant punished and terminated Plaintiff for exercising her First Amendment right to free speech, informing of such impending termination even as the CPS case was dismissed and the students restored to their parents. The students' father spoke on Plaintiff's behalf at the DISD Level II hearing, but Defendant refuses to rescind the termination or address the damage caused to Plaintiff as a direct and proximate result of its wrongful conduct.

## V. DAMAGES

5.1 As set forth above, Plaintiff seeks her damages herein, to which she is entitled under federal statute, including loss of income and benefits, damage to her reputation, damage to her ability to teach, mental anguish, nominal damages, as well as attorneys' fees.

## VI. ATTORNEYS' FEES AND COSTS

6.1 Plaintiff has retained the law firm of Hill Gilstrap, P.C. to represent her in connection with this matter, and has agreed to pay the firm reasonable and necessary attorneys' fees. In addition to and without waiving and/or limiting any other relief requested in this Complaint, Plaintiff seeks, to the extent permitted by applicable law, including but not limited to 42 U.S.C. Section 1988, her reasonable attorneys' fees and costs to be incurred herein, in such amount as is equitable and just.

## VII. JURY DEMAND

7.1 Pursuant to Rule 38, Federal Rules of Civil Procedure, Plaintiff requests trial by jury.

**PRAYER**

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that Defendant be cited to appear and answer, and that, upon final hearing, Plaintiff recover judgment against Defendant for the relief set forth below:

a. Any and all amounts recoverable and/recognizable as damages and/or nominal damages;

b. Litigation expenses and costs, including but not limited to her reasonable and necessary attorneys' fees;

c. Pre-judgment and post-judgment interest, at the maximum rate allowed by law; and

d. Such other and further relief, whether general or special, at law or in equity, to which Plaintiff may show herself justly entitled.

Respectfully submitted,

*/s/ Frank Hill*

Frank Hill – State Bar No. 09632000
fhill@hillgilstrap.com
Stefanie M. Klein – State Bar No. 11565650
sklein@hillgilstrap.com
Anne Michels – State Bar No. 18863600
amichels@hillgilstrap.com

**HILL GILSTRAP, P.C.**
1400 West Abram Street
Arlington, Texas 76013
Telephone: 817-261-2222
Facsimile: 817-961-4685

**ATTORNEYS FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**

I hereby certify that on February 28, 2024, a true and correct copy of the foregoing document was served on all counsel of record via the ECF system.

*/s/ Stefanie Klein*
Stefanie Klein