IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| DR. AMY ANDERTON, | § | |
|     Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:23-cv-02596-G |
| | § | |
| DALLAS INDEPENDENT SCHOOL | § | |
| DISTRICT, | § | |
|     Defendant. | § | |

## PLAINTIFF'S THIRD AMENDED COMPLAINT

NOW COMES DR. AMY ANDERTON, Plaintiff in the above-styled and numbered cause ("Plaintiff"), and files this, her Third Amended Complaint, as agreed to by the parties and permitted by this Court's order, complaining of the Dallas Independent School District, ("DISD"), Defendant herein. Plaintiff would respectfully show the Court the following:

## I. PARTIES

1.1     Plaintiff Dr. Amy Anderton is an individual residing in Dallas County, Texas. She has been employed by DISD for the past nine years. She is a sixty-year-old heterosexual Caucasian woman.

1.2     Defendant Dallas Independent School District is a public school district organized and existing pursuant to the laws of the State of Texas.  Defendant is a "state actor" within the meaning of applicable law and the actions complained of herein comprise "state action" and were taken under color of law. Defendant has been served and has appeared through counsel in this action.

## II. JURISDICTION AND VENUE

2.1     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331; the Age Discrimination in Employment Act of 1967 (29 U.S.C. §§ 621 *et. seq.*); and Title VII of the Civil

Rights Act of 1964, (42 U.S.C. § 2000e *et seq*.).

2.2.    Venue is proper in this district and division pursuant to 28 U.S.C. § 1391(b), as all or part of Plaintiff's claims accrued in Dallas County, Texas, which is within this District and Division.

## III.  FACTUAL BACKGROUND

3.1.    Plaintiff was an employee of DISD for nine years, ending on or about December 12, 2023. Her position was Curriculum Director for World Languages. She oversaw teachers of languages other than English and implemented new programs and new courses for the twelve foreign languages taught in DISD. With the team she supervised, she also supported students and teachers in obtaining seals of biliteracy and bilingualism, which officially recognize when a student has reached certain levels of competence in more than one language.

3.2    Beginning in early 2023, Plaintiff was subject to discrimination based on her race (Caucasian) and her age (60). The organizational structure of DISD's Academic Services, comparing its racial and age composition in late 2022, and as it stands today, provides key context for understanding Plaintiff's allegations of discrimination.

**Structure of Academic Services in 2022 v. Today**

3.3    In late 2022, DISD's academic departments were divided into two main areas under its Chief Academic Officer. One division, under a deputy chief, included the STEM areas, with one executive director, and directors over Science, Math, Computer Science, and Health/PE. The other division, headed by an assistant superintendent, included two executive directors supervising directors in Visual and Performing Arts, Library Services, World Languages, Social Studies, and Reading/Language Arts.

3.4    At that point, there were four white women in their late fifties/early sixties who

were directors of Health/PE (Barbara Johnson), Visual/Performing Arts (Monica Hayslip), Library Services (Gay Patrick), and World Languages (Plaintiff). Each of them have since been forced out --- either fired or pushed to retire earlier than they had planned, by either Dr. Broughton or Dr. Hill.

3.5    After those four were pushed out, additional older women in Academic Services below the director level were also removed – Athena Newton, Shirley Steele, Martha Castillo, all approximately 59 or over, and all in Social Studies; and Belinda Jackson from Library Services. All of these older women were replaced by significantly younger individuals, primarily younger Black women, except for one replacement who was a younger Hispanic woman.

3.6    In addition to eliminating older women, Academic Services' racial composition has had a make-over. In late 2022, between the Chief Academic Officer and the directors over the academic subject areas were two Black women, one Hispanic man, one white woman, and one white man (the deputy chief, the assistant superintendent, and three executive directors). Now there are only two Black women – deputy chiefs, Dr. Michele Broughton and Dr. Elena Hill – directly below the Chief Academic Officer, and directly over five executive directors. Four of the executive directors are Hispanic, and one is Black (Debbie Murillo, Stella Kastl, Dr. Charissa Govan, Dr. Aaron Aguirre-Castillo, and Dr. Roberto Gonzalez).

**Plaintiff's Position in 2022 and thereafter**

3.7    Plaintiff was a Director II, ranking below executive directors, and above the ranks of Director I, manager, and coordinator. In late 2022, Dr. Lisa Whitaker was a coordinator in Operational Services, which is entirely separate from Academic Services.

3.8    As curriculum director for World Languages, Plaintiff reported to a younger Black woman, Arlena Gaynor, who was executive director over the directors of World Languages, Social

Studies, and Reading/Language Arts. Beginning in July 2023, Plaintiff reported to one of DISD's two Deputy Chiefs of Academic Services, Dr. Elena Hill. Dr. Hill and her counterpart Dr. Michele Broughton, the other deputy chief, are both younger than Plaintiff, by about ten years, and Black. The Chief Academic Officer is younger than Plaintiff. Virtually every director left at DISD is younger than Plaintiff.

**Discrimination based on age and race**

3.9    The basis DISD gave for Plaintiff's termination was pretextual. As will be explained below, Plaintiff violated no policies and committed no wrongdoing, yet she was terminated with no warning or lesser discipline despite 36 years of stellar performance as a teacher and administrator. The actual motivating factor in Dr. Hill's recommendation to terminate Plaintiff was discrimination. Dr. Hill, along with the chief and the other deputy chief of Academic Services, and DISD as a whole, favor Black employees over white employees, and younger employees over older employees. Examples specific to Academic Services are set forth above. Dr. Hill and Dr. Broughton have systematically replaced older employees with younger individuals, and particularly with employees who are not white. Plaintiff was a victim of that favoritism.

**Others similarly situated were treated more favorably, and Dr. Lisa Whitaker is a specific comparator, outside Dr. Anderton's protected class, who was treated more favorably**

3.10    At the time Dr. Anderton was fired, she supervised three coordinators in world languages: Jazmin Mier, Giovanni Rodriguez-Rivera, and YieJe Lee.  One of the three has left DISD, but as of the end of August, 2024, Dr. Lisa Whitaker is now the director supervising the other two, as shown in the screenshot below. She has literally been put in Plaintiff's place, despite having no qualifications in world languages.



3.11    Plaintiff first fell victim to favoritism toward Dr. Lisa Whitaker in 2023, when Dr. Anderton's World Languages team, along with Social Studies and Library Services, were moved to a new building. Social Studies and Library Services had furniture in the new building, but World Languages did not. Dr. Anderton asked that her team move later, when its furniture was in place, but Dr. Whitaker denied the request. During the move, Dr. Anderton was continually thwarted and misled by Dr. Whitaker, then a coordinator in operations, who had a major role in overseeing the move. As a director, Dr. Anderton ranked ahead of Dr. Whitaker, although they were in different portions of the DISD organizational chart.

3.12    At the beginning of the move, Dr. Anderton's boss was Arlena Gaynor, also African-American, and Ms. Gaynor's boss was Michele Broughton, also African-American. Ms. Gaynor and Ms. Broughton permitted Dr. Whitaker to separate Dr. Anderton's team, refuse reasonable requests by Dr. Anderton, and to harass and make Dr. Anderton's job as difficult as possible. Dr. Whitaker was given the authority to make decisions about when and how Dr.

Anderton's World Language team would move, where they would work while permanent space was finished, what furniture could be ordered and when, whether they could have a coffee maker and other matters which allowed her to bully Dr. Anderton with impunity.

3.13    By way of example, from the time of the move in January, Dr. Anderton had been attempting to get permanent furniture for her office (that Dr. Whitaker had promised). Dr. Whitaker went back and forth between "we will select furniture for you" and "I'll get a catalog for you so you can order what you want" several times. Around March or April, Dr. Anderton picked out some furniture from the catalog Dr. Whitaker provided. Dr. Whitaker then said the catalog was out of date and gave Dr. Anderton a new catalog. Dr. Anderton picked out a desk and a hutch. Dr. Whitaker told Dr. Anderton several times she had already ordered it.

3.14    On June 8th, Plaintiff attended a library event at Townview High School where she spoke with Barry Honore, the CEO of the furniture company. He stated that Dr. Whitaker had not purchased any furniture for Dr. Anderton. Even after this, Dr. Whitaker kept telling Plaintiff that the furniture had been ordered. Meanwhile, the other members of Plaintiff's team were going to be in bullpens, similar to cubicles. Plaintiff noticed that their bullpen would be set up in such a way that everyone who wanted to use the designated conference rooms (and there were at least a dozen people a day from other departments, other floors, and even other companies/outsiders that used them) had no choice but to walk right through the World Language team's workspace. No other bullpen was set up where people had to walk through it.

3.15    When Plaintiff pointed this out to Dr. Whitaker, she insisted that it would be set up where people would walk all the way around all three sets of bullpens, not through the middle. As they began building, it was clear this was not the case. Plaintiff appealed to Dr. Whitaker again, asking her to move the (furniture) wall closer in towards the center so that people could walk

around the World Language workspace and not right through the middle. Dr. Whitaker insisted that people would not walk through the middle. Even while she and Plaintiff talked, several people (including Dr. Whitaker's boss) walked right through the middle -- in fact, every single person. She insisted those were anomalies and it wouldn't happen on a regular basis.

     3.16    Dr. Whitaker originally said the furniture wall could not be moved because it would make the bullpens too narrow. When Plaintiff measured the other new bullpens and showed Dr. Whitaker that many of them were exactly the same or even more narrow, Dr. Whitaker came up with another objection. She said there was no way to do it because the electrical had to be set up a certain way. Plaintiff spoke to the electrician, with Dr. Whitaker there, and asked if it were possible to hook up the electric if the bullpen was set up the way Plaintiff suggested. He said it was and what it would take to do so. At that point, Dr. Whitaker finally agreed to have the (furniture) wall moved and the electrical hooked up so that people would walk along the side of the World Language bullpen to the conference room, and not disrupt their workspace.

     3.17    When Dr. Elena Hill became Dr. Anderton's boss in July 2023, she refused to do anything to help Dr. Anderton counter Dr. Whitaker's actions, and in fact, ordered Dr. Anderton to apologize to Dr. Whitaker. Further, in her first week as Dr. Anderton's boss, Dr. Hill wrote Dr. Anderton up (a "Letter of Concern"/LOC) for emailing a chief over operations. Dr. Anderton had contacted him in her efforts to have her team's bullpen not be thoroughfare, because the electrician told her he was the one who would know if it were possible or not. Dr. Anderton did not realize she was not allowed to contact the operations chief, because she thought he was at the director level. Dr. Hill and Dr. Whitaker are both African-American. Dr. Hill's favoritism toward Dr. Whitaker, including disciplining Dr. Anderton for complaining to the operations chief about Dr. Whitaker, were discrimination against Dr. Anderton based on race.

3.18    During the move, Dr. Whitaker, upon information and belief, moved from coordinator to director, still in operations. After that, Dr. Whitaker was promoted out of operations to a director role in Academic Services, as Director of Health and P.E. Dr. Whitaker is only certified in grades 4-8 science, and does not have a background in P.E. She replaced Barbara Johnson, an older white woman, who was fully qualified. Further, after Plaintiff was fired, additional reorganization put Dr. Whitaker over "Academic Enrichment/Support," in which role she currently supervises the World Languages staff previously under Plaintiff. Upon information and belief, Dr. Whitaker has no background in world languages, and does not speak a second language. Unlike Plaintiff, she is not Principal Certified, which requires leadership and management skill, nor certified in ESL, which deals with language acquisition. Besides lacking those certifications which Plaintiff has, Dr. Whitaker is otherwise less qualified than Plaintiff to oversee World Languages. Plaintiff has a degree in German and extensive experience in curriculum development, as well as testing and certification procedures.

**Other specific incidents that permit the inference that the adverse actions against Dr. Anderton were taken because of her race or age**

3.19    The discrimination Plaintiff endured up to September 2023 included the following: she and her team were excluded from meetings, moved into inferior and inconvenient offices, denied necessary furniture, and lied to about orders for furniture. DISD created and allowed a hostile work environment, intended to force Plaintiff to retire or quit. At sixty years of age, she is at least ten years older than all of her recent supervisors (and their supervisors), who favor younger employees. Plaintiff's supervisor treated her with condescension, permitted African-American staff to target Plaintiff for ill-treatment, and treated younger employees and African-American employees more favorably than Plaintiff.  Plaintiff planned to continue working in the DISD for

at least five more years. With five more years in the district, Plaintiff would more than quadruple the monthly retirement payment for which she will be eligible at age 65.

3.20    Both before and during the move, Plaintiff's former boss, Ms. Gaynor, excluded her from emails containing information Plaintiff was expected to know, and left her out of meetings at which all other Directors reporting to Ms. Gaynor (other than Barbara Johnson) were included. Even some who did not report to Ms. Gaynor were included. This caused Plaintiff several times to almost be late on assignments when she was told at the last minute of a deadline regarding which her colleagues had already been notified.

3.21    The meetings from which she was excluded included principals' trainings, assistant principals' trainings, and many others. If only the "4 core" (Language Arts, Social Studies, Math, and Science) were invited, such exclusion would have made sense, but these almost always included Visual/Performing Arts, Special Education, Dual Language, Professional/Digital Learning, and many other departments, not ONLY the "core 4" departments. The only other director who was left out of these emails and meeting notices was an older (60+) white woman, Barbara Johnson. If Plaintiff was not excluded in this way based on her race, it was based on her age, or a combination of her race and her age. No Black director was excluded. No younger director was excluded. All of the directors who were included were treated more favorably than Plaintiff.

3.22    In 2023, Plaintiff received a very prestigious award from Fulbright called the Fulbright Leaders for Global Schools Program, made up of 16 administrators from across the country. She told her boss, Dr. Hill, about it. Dr. Hill said, "What's Fulbright?" Plaintiff sent Dr. Hill all the information about the award including a press release. Plaintiff asked Dr. Hill if she could send the press release to the "HUB", DISD's internal newsletter about announcements and accomplishments of employees. Dr. Hill said she would read it and let Plaintiff know. At least two

weeks later, Plaintiff asked if Dr. Hill had read the press release and the other information. She said no, but she would. Another week or two later, Plaintiff asked again, and asked if she (Plaintiff) could share the info with the HUB. Dr. Hill said she had read it and answered, "No, you can't." Nor did Dr. Hill tweet about Plaintiff's accomplishment. Dr. Hill tweets regularly about Debbie Murillo and Patricia Alvarado-Barnes (she supervises both of them, as she supervised Plaintiff, and both of them are Hispanic). Additionally, the overwhelming majority of her tweets include or feature pictures of African-Americans and/or Martin Luther King Jr. Elementary School, a predominately African-American school. Dr. Hill treated Plaintiff less favorably than she treated (and treats) these younger, non-white employees.

3.23    The District-wide preference for younger employees is seen in the composition of Academic Services and directors throughout DISD. Plaintiff worked in Academic Services, where there were 26 people (including Plaintiff) with the title of Director I or higher. All were younger than Plaintiff, except a JROTC colonel, who is not even a "full" DISD employee, but is, on information and belief, employed or mostly employed by the federal government.

3.24    At the time Plaintiff was terminated, DISD had 171 employees with the title of Director I or above (one step below Plaintiff's title of Director II). That number includes all Director I level and above employees who neither teach nor work in the schools, and also includes executive directors over principals, the financial department, the construction department, the police and security department, the racial equity department, the technology department, HR, the academic and transformation department, and the operations department-such as food services and transportation and HVAC, etc. Of those 171, only 17 were older than Plaintiff, and only three of who were older than Plaintiff are also Caucasian. Virtually none of these older employees interact directly with students, and none get involved in student schedules and graduation credits and

placement the way Plaintiff did.

    3.25    Along with favoring younger employees, DISD's demographic figures show that central staff positions are disproportionately filled with Black applicants.

The student demographics of DISD as of 2022-2023 are as follows:

70% Hispanic
21% Black
6% White
3% other

The teacher demographics of DISD as of 2021-2022 are as follows:

33% Hispanic
34% Black
27% White
5% other

The central staff demographics of DISD as of 2023-2024 are as follows:

28% Hispanic
41% Black
21% White
2% other

**Plaintiff's Termination at the Recommendation of Dr. Hill**

    3.26    In late September 2023, Defendant DISD informed Plaintiff that she was being put on administrative leave.  On November 8, 2023, Dr. Hill, as Deputy Chief Academic Officer, and Dr. Anderton's supervisor, signed a recommendation letter stating,

    "I am recommending to the Superintendent of Schools that [Dr. Anderton] receive the following disciplinary action Non-Renew/Terminate pursuant to Board Policy.

    The recommendation is being made for the following reasons This recommendation is being made as a result of substantiated findings from the investigation that the employee violated district policy, specifically DH

(Exhibit) and DH (Regulation)."

On the next day, November 9, 2023, Dr. Gaylord, as Chief Academic Officer and next level supervisor, also signed the letter.

3.27    On November 17, 2023, Plaintiff was informed by telephone that the process of termination had begun, based on unspecified alleged policy violations. She was informed that she would receive an email officially informing her of her termination, after which she would have fifteen days to file a grievance. Plaintiff was terminated and filed her grievance. She has had a Level II hearing, at which her grievance was denied.

3.28    Also in the telephone call of November 17, 2023, Plaintiff was told that she would be contacted to set up a meeting to discuss the termination process (at which she would not be allowed to be represented by counsel). Plaintiff was never contacted to set up such meeting. On December 12, 2023 – her sixtieth birthday -- Plaintiff received her letter of termination, which included several misleading or false statements. The letter states that "Your "improper actions were in violation of FL(Legal and Local) and DH(Exhibit), which merits termination of your employment." These were the same policies, FL and DH, set forth in Dr. Hill's recommendation.

**The Reasons for Termination are Pretextual**

3.29    After making several requests, Plaintiff finally – at the end of November – received a memo dated November 7, 2023, setting forth the results of an investigation by DISD's Professional Standards Office, which appears to be DISD's pretextual reason for her termination.

3.30    For several reasons, it is clear that Dr. Hill and DISD seized upon a situation that should not have led to termination, in order to get rid of an older white employee, whom they have replaced with a younger, Black employee, Dr. Whitaker.

3.31    First, Plaintiff has an impeccable performance record. She had no negative

performance reviews over thirty-six years in education. The other older white women, mentioned above, who lost their jobs, similarly had no negative performance reviews. Plaintiff had no disciplinary history – only local "reprimands" between her and her bosses that were never filed in HR and were always resolved satisfactorily. The termination of Plaintiff was not based on merit or job performance but on age or race. The pattern of dismissing older employees despite a lack of negative performance evaluations or previous disciplinary record permits the inference that DISD, and specifically Academic Services, has engaged in a systematic effort to remove older, white workers. But for Plaintiff's age and race, she would not have been terminated.

3.32    Second, Plaintiff was put on leave at the end of September 2023, purportedly to permit an investigation to be conducted. While she was still on leave, however, before any investigation had concluded, Dr. Anderton's supervisor, Dr. Hill, posted a photo on social media showing herself *with the three employees who reported to Dr. Anderton*, calling it "Team of Three," as if Dr. Anderton (not pictured) did not lead that team.  All persons in the photograph, including Dr. Hill, are younger than Dr. Anderton, and all of them are Hispanic, Asian, or Black:



3.33    This demonstrates that Dr. Hill had already made the decision that Dr. Anderton would be terminated. Moreover, it contrasts with Dr. Hill's reaction to Dr. Anderton's award from Fulbright, which she treated with disdain, neither promoting it herself on social media nor permitting Dr. Anderton to forward the information about it to the DISD HUB. Again, Dr. Anderton was treated less favorably than younger, non-white employees.

**Dr. Anderton's supposedly termination-worthy conduct**

3.34    DISD put Dr. Anderton on leave and conducted an "investigation" after Dr. Anderton spoke with two students, in late September 2023. These two students were brothers, were from Germany, and they were the sons of friends of Dr. Anderton. One of the students (Student 1) was in a Spanish class within Dr. Anderton's scope of supervision, and one of them (Student 2) was at an elementary school where Dr. Anderton had reason to speak with the principal. At the time, the students were in foster care, but in mid-November they were returned to their parents after a baseless CPS case was dismissed. They were returned to their parents the same day Plaintiff was informed she would be terminated.

3.35    DISD's investigation purported to determine that in visiting campuses in the district, and looking in on foreign language classes or students who might benefit from programs offered by Plaintiff's team, Plaintiff had improperly met with the two students. The two students were brothers, non-native speakers of English, and new to the district, having previously been homeschooled since coming to the US. Plaintiff knew them because she is a close family friend of their parents. The family is from Germany, and neither the parents nor the students knew anything about American public schools. Because children were in foster care, they had no one to advocate for them.

3.36    Plaintiff did not know the students were enrolled in DISD until she saw their names in reports that she received as part of her job duties. She was concerned about them on a personal level, but she also had reasons related to her district position for visiting their campuses, and for speaking to these native German speakers.

3.37    Plaintiff first learned that Student 1 and Student 2 were enrolled in DISD when they appeared on a Home Language Survey report (HLS). The state of Texas requires schools to collect

information regarding languages spoken by and to students at home, at the time they enroll. In her position as Director of World Languages, Plaintiff received HLS data from the district's Evaluation and Assessment Department every year. Specifically, at the beginning of the 2023-2024 school year, Plaintiff requested HLS data from Sandy Smart, as she did at the beginning of each school year, which the district collects from all enrolled students regarding the languages spoken at home.

3.38    Plaintiff filtered the data from the HLS by the school attended and the languages spoken, and in 2023 she saw Student 1 and Student 2 on the report. As she typically did, she filtered by language to see if there were native German speakers because German is of particular interest to her. She filtered by school because her team and she would divide up the 80 schools they served. Plaintiff took Spruce High School because it is one of the rougher schools and as the department's director, she considered it her responsibility to take it on rather than sending her less experienced team members.

3.39    Part of Plaintiff's job was to see that students were placed in the proper language and level of foreign language so that they are able to graduate. When she saw Student 1 at Spruce, she looked on PowerSchool to check his schedule so that she knew what time of the day to talk to him and check in with World Language teachers, killing two birds with one stone.

3.40    When she checked PowerSchool, Plaintiff saw Student 1 enrolled in Spanish I. She knew that Student 1 had previously been homeschooled while in the US, and had not ever attended American schools. She also had only spoken with him in German. She was concerned that his enrollment in Spanish was not a good fit. She went to his school to ask him how Spanish was going and if he preferred to test out of foreign language with his native German.

3.41    Testing out was a program that Plaintiff brought to Dallas ISD herself, to help

thousands of students receive credit for their native language rather than sitting through two years of a foreign language needlessly. This was a major reason that Plaintiff visited with students, and not just teachers, principals, and counselors, when she visited schools. The testing for credit program is one that Plaintiff got put into policy and that she worked to keep alive for the benefit of thousands of students.

3.42    She also knew the student to be quite intelligent and dedicated, so she wanted to see if he needed any other support with classes in English, since she was unfamiliar with his ability in English.  Additionally, if his English ability was ok, she wanted to explain to him how to advocate for himself to enroll in honors classes, since he is quite dedicated and quite intelligent. He had never been in any American school so he would not know to advocate for himself for such classes.

3.43    Similarly, in the case of Student 2, who was a German-speaking child in elementary school, there was a product that Plaintiff was going to make available for children whose home language was one of the languages offered by the program where support was not available in that language at DISD (i.e. French, German, Japanese, Chinese, or Arabic). In most cases, if the child doesn't speak English, they have parents who have at least a basic education and can support their children in their native language (explaining basic math and science concepts, etc). Student 2, however, did not have a parent at home who could help explain things at home in his native language, because he was in foster care, so Plaintiff considered his situation the most urgent. Therefore, she had reason to go to his school in part because he and others could benefit from that resource.

3.44    Plaintiff went to the high school, visited and observed Student 1's Spanish class, spoke with the Spanish teacher, and asked the teacher if she could have a conversation with Student

1. She wished to find out how his Spanish class was going, and to make sure he knew about the possibility of testing out of foreign language, and the role of the counselor. She had brought him German candy, which she gave him. However, during the conversation, she also asked about his eye, which looked injured, and Student 1 began to cry and tell her of issues taking place in his foster home, and his fear of seeing a doctor about his eye. He wanted to talk to his parents, with whom Plaintiff knew he had supervised visitation only. She attempted to get the counselor involved, since the counselor's office was very near where she was having this conversation. The counselor's staff told her each time she checked that the counselor was unavailable. Finally, Plaintiff called Student 1's parents and let them comfort him, while she listened to make sure nothing was said to expose the location of the student. Since she understood German, she considered that she would know if Student 1 said anything he should not.

3.45    The next day, Plaintiff returned to the high school to explain to the counselor what Student 1 had told her about his situation, the issues in the foster home, and Plaintiff's concerns that he was depressed, or might hurt himself, which she expected the counselor to check on, and to report if necessary. The counselor assured Plaintiff that she would do so. Upon information and belief, the counselor never checked on Student 1, and never made any report.

3.46    Plaintiff also visited the school attended by Student 2, and spoke to him while his class was having indoor recess. She did not get to visit with the principal at length, but Plaintiff did not always have appointments when she went to schools. Her team, and others in Academic Services, had been encouraged by the Chief Academic Officer, Ms. Gaylord, to be out in the schools. Sometimes she had appointments with principals and sometimes she did not. She spoke with world language teachers, and with students. During the time period she visited Students 1 and 2 at their schools, she also visited a student from Egypt, to check on his class assignment and to

discuss options with him.

3.47    In the alternative, (because Defendant DISD has accused her of determining the students' schedules "in part for a personal purpose," and for using "her District assignment" to locate and meet with the students "for non-district purposes"), she was acting out of concern for the welfare of the two students and her interactions with them were protected speech. Once the conversation with Student 1 went from the expected discussion of his Spanish class to him expressing his fear about going to the doctor, about his concern about his little brother's behavior in the foster home, about his concerns that his foster mom regularly walked into his room and bathroom without knocking and runs her fingers through his hair, about his fears that his eye had some specific medical problem that was beyond Plaintiff's ability to understand in German, Plaintiff attempted to get the Spruce high school counselor involved. Her office was very near where Plaintiff and Student 1 were standing in the hall. The counselor was not available, however, despite Plaintiff's repeated efforts to get her involved. Plaintiff has been trained to report issues to CPS, but she was hearing from Student 1 that CPS was the problem. Plaintiff's actions at that point were to help the child, keeping in mind that she would know if he began to say anything in German to his parents that would not be appropriate in a CPS/foster care situation.

3.48    Thus, Plaintiff was performing her job duties and found herself in an unanticipated situation for which she had not received any specific training. She handled it as professionally as she could and returned the next day to bring the situation to the counselor's attention. Yet DISD has used these events as a pretext for termination, rather than an opportunity to simply correct or discipline a valuable and highly qualified employee.

**The stated reasons for Plaintiff's termination were false and pretextual**

3.49    The letter informing Plaintiff of her termination states that DISD relied on its own

policies "FL(Legal and Local) and DH(Exhibit)" in terminating Dr. Anderton. FL(Local) states that "School officials have a 'legitimate educational interest" in a student's records when [inter alia] they are working with the student; considering disciplinary or academic actions."  Dr. Anderton had legitimate educational interest in the records of Students 1 and 2 which she accessed because they were German-speakers. She had information about non-English speakers as part of her job – Director of Curriculum of World Languages. The other policy she supposedly violated, DH(Exhibit), is an "Educators' Code of Ethics." Dr. Anderton did not, and would not, endanger any child, and in fact did the opposite, to the best of her abilities. She had no notice whatsoever that her actions with regard to Students 1 and 2 were violations of these policies or terminable offenses.

3.50    The "stated reasons" described in the December 12, 2023 termination letter (the "Letter"), even beyond the policies referenced, included false statements, rendering the basis for termination pretextual. In its first bullet point, the Letter states: "You were the subject of a Professional Standards Office Investigation dated November 7, 2023, that substantiated allegations against you."

3.51    However, the PSO investigation mentioned in the Letter looked into two accusations against Plaintiff. Although the PSO report contained numerous false statements and errors, it also cleared Dr. Anderton of one of the two accusations. ***She was cleared of*** "accessing and relaying information to Student 1 and Student 2's parents or others in violation of District Policy."

3.52    The accusation for which "substantiation" was found was that she "used her District assignment to locate and meet with Student 1 and Student 2 for non-district purposes." This was also false, as explained above (paragraphs 3.31 through 3.39) and below.

3.53    In its third bullet point, the Letter states: "You improperly used PowerSchool to determine where Student 1 and Student 2 attended school. You did not have a legitimate educational interest for accessing this FERPA protected information. As such, your actions were in violation of the law and District policy."

3.54    The statement that Plaintiff "did not have a legitimate educational interest" is false, and therefore the conclusion that she violated the law or any policy is invalid. As above, Plaintiff's job duties included visiting schools and students who needed the support of her World Languages team. Further, she did not need PowerSchool to determine where Student 1 and Student 2 attended school. She already had that information from the Home Language Survey, which told her where students attended school, if they were students who might be in need of World Language support. The information from PowerSchool simply told her Student 1's class schedule, so that she would know when he was in his World Language class (Spanish I).

3.55    In its fourth bullet point, the Letter states: "During your visit with Student 1, you allowed Student 1 to use your personal cell phone to hold an approximately 15-minute unsupervised conversation with his father, which was prohibited due to the active CPS investigation."

3.56    The telephone conversation was not unsupervised, because Plaintiff – a fluent speaker of German – was there and cautioned Student 1 not to say anything to his parents about where he was living or anything else inappropriate. Again, the PSO investigation concluded that Plaintiff **had not relayed information to the Students' parents**. Moreover, at the weekly "supervised" visits between Student 1 and his parents, the family spoke German and anything could have been disclosed without the CPS representative knowing, since the representative did not understand German. Plaintiff would have preferred to have the Spruce counselor participate in

helping Student 1 once the conversation went from his Spanish class to his worries about other matters, but the counselor remained unavailable the whole time Plaintiff was in the hall (near the counselor's offices) with Student 1.

3.57    In its fifth bullet point, the Letter states: "you made an unannounced visit to Moseley Elementary School where Student 2 attended school. . . . You visited with the principal for merely 3-5 minutes."

3.58    It was extremely common for Plaintiff to visit campuses without a specific appointment with the principal. Plaintiff did speak to the principal briefly when she was available, about the "Little Sponges" program to support elementary students who did not have support in English at home, which Plaintiff had a purchase order for and was figuring out how to implement in a non-traditional way.

3.59    The Letter's fifth bullet point continues, ". . . spent the remainder of your approximately 20 minute visit in Student 2's classroom speaking only with Student 2 and no other students." On the contrary, Plaintiff spoke with the teacher in that classroom, and when she spoke to Student 2 for a few minutes she spoke also to the student who was playing with him.

3.60    The Letter's fifth bullet point concludes: "It is apparent that the actual reason for your visit was to meet with Student 2 *to circumvent the CPS investigation restrictions regarding visitation*."(emphasis added). This is so false and inflammatory that can only be pretextual. Plaintiff went to Student 2's school because he showed up as a German speaker on the Home Language Study which she received in doing her job. She had a program (Little Sponges) that might have helped him. In no way was she there to "circumvent the CPS investigation*," nor was there any CPS restriction on Plaintiff interacting with Student 2, Student 1 or any other students.* Plaintiff never interfered in CPS' investigation. No one from CPS ever contacted Plaintiff to say

that Plaintiff did anything wrong. In fact, CPS contacted Plaintiff to ask her if she wanted to foster the children and cleared her to be an "authorized visitor" for the children, encouraging her to visit the children any time she wanted.

3.61    The final bullet point of the letter begins, "Your action placed both Student 1 and Student 2 in danger." This is blatantly false. Plaintiff placed no child in danger. If any DISD employee placed children in danger during this episode, it was the Spruce counselor who failed to follow up and check on Student 1, much less to report the issues at his foster home.

3.62    It continues, ". . . under the guise of performing your job duties, you improperly used your title and badge to enter schools for the sole purpose of accessing Students 1 and 2." But when Plaintiff entered the schools and spoke with the students she *was performing her job duties*. During those same days, she went to Dorsey Elementary School as well, which along with Mosely, had some of the 185 students (District-wide) who could have benefitted from Little Sponges. She had gone earlier in the morning to visit a student who was from Egypt at Conrad High School, regarding his language class placement. This was what she and her team did for students – it was not done under any "guise,"; it was literally Plaintiff's job.

3.63    In a final burst of disingenuous pretext, the final bullet point states, ". . . your unauthorized visits with Student 1 and Student 2 removed them from valuable class instruction time and removed you from your duties as Director of World Languages."

3.64    This is completely false. Student 1 was in a World Language class (Spanish 1) when Plaintiff visited him, which is exactly the time someone from World Languages (such as Plaintiff) would most appropriately speak to him, since it was about his placement in that class. According to the teacher, the student "didn't miss anything because they were watching a video." By approaching him when she did, Plaintiff could check with his Spanish teacher and also Student 1,

without taking Student 1 out of English or science or some other instructional class that had nothing to do with World Languages. In the case of Student 2, his class was having indoor recess. He was playing on the floor, not having "valuable class instruction time." Plaintiff did not interrupt any instructional time at any school – Not at Spruce, Mosely, Dorsey, or Conrad, As far as her duties as Director of World Languages, her visits to the students' schools were part of those duties.

3.65    The accusations against Plaintiff in the termination letter are so inaccurate and misleading that DISD's reliance upon them supports Plaintiff's contention that such reasons are pretextual, and that Plaintiff's firing was discriminatory. She was terminated rather than receiving any level of warning or lesser reprimand, after 36 years as a teacher and administrator without any disciplinary actions against her; the events simply do not support such a termination. The hostility within Academic Services toward older white women, and favoritism shown toward younger DISD employees, and toward African-American employees including Dr. Whitaker, provide a much more likely basis for Plaintiff's termination.

3.66    DISD has further made a report to SBEC, endangering Plaintiff's teaching credentials. As a result, the publicly available status of Plaintiff's teaching certificate shows that she is under investigation, a designation that makes employment in education exceedingly unlikely, if not impossible.

## IV.  CAUSES OF ACTION

*Alternative Pleadings*.  To the extent necessary, each of the claims set forth below is pleaded in the alternative.

### Discrimination Claims

4.1    All factual allegations set forth above or below are incorporated herein by this reference.

4.2     DISD used Plaintiff's conversations with the two students as a pretext to terminate Dr. Anderton. In reality, Dr. Anderton was terminated her employer, DISD; her supervisor, Dr. Hill, and the chief and deputy chiefs of Academic Services, all favor younger administrators, and African-American employees. Dr. Hill or others in Academic Services wanted to replace Plaintiff with Dr. Whitaker, or simply wanted to get rid of her as a result of racial discrimination and age discrimination. Dr. Whitaker, and others, as set forth above, were treated more favorably than Plaintiff, and ultimately Plaintiff suffered the adverse employment action of being terminated.

Race and Age Discrimination

4.3     Dr Anderton, who is Caucasian, has been treated less favorably than African-American colleagues, up to and including being terminated. The races of the DISD employees involved are as follows:

Dr. Anderton – Caucasian

Dr. Anderton's boss, Dr. Elena Hill – African-American

Dr. Anderton's former boss, Arlena Gaynor – African-American

Dr. Anderton's former boss's boss, Dr. Michele Broughton – African-American

Dr. Anderson's replacement, Dr. Lisa Whitaker – African-American

4.4     All of Dr. Hill, Ms. Gaynor, Dr. Broughton, and Dr. Whitaker are a decade or so younger than Dr. Anderton, who turned 60 on the day she was officially terminated.

DISD's Basis for Termination was Pretextual

4.5     As set forth above, the reasons given by DISD for Plaintiff's termination, which was recommended by Dr. Hill, do not support the action taken.

Exhaustion of Administrative Remedies

4.6     Plaintiff timely filed a charge of discrimination in employment against DISD, in

administrative proceedings with the Equal Employment Opportunity Commission, in which she asserted that she was treated in a disparate and discriminatory manner due to her race (Caucasian), her age (sixty), and her sexual orientation (heterosexual), in violation of federal law, including Title VII of the 1964 Civil Rights Act, and the ADEA (Age Discrimination in Employment Act of 1967).

4.7    On February 23, 2024, Plaintiff received a letter from the EEOC, attached hereto as Exhibit A, stating that the Department of Justice would issue the notice of right to sue directly to her. On or about May 7, 2024, Plaintiff received a Dismissal and Right to Sue under the ADEA from the EEOC, a true and correct copy of which is attached hereto as Exhibit B. On the same day, she received a Notice of Right to Sue from the United States Department of Justice, giving her 90 days to sue on her Title VII claims. A true and correct copy of such Notice is attached hereto as Exhibit C. Plaintiff has thus exhausted her administrative remedies with respect to her federal discrimination claims, and sues for discrimination by DISD under Title VII and the ADEA. The conduct of DISD in creating a hostile work environment, favoring African-American employees, favoring employees under 55, and terminating Plaintiff, has caused Plaintiff damages for which she now sues.

## V. <u>DAMAGES</u>

5.1    As set forth above, Plaintiff seeks her damages herein, to which she is entitled under federal statute, including loss of income and benefits, lost value of retirement, damage to her reputation, attorneys' fees, as damages, for contesting DISD's report to TEA and SBEC, damage to her ability to teach, mental anguish, nominal damages, as well as attorneys' fees.

## VI.  ATTORNEYS' FEES AND COSTS

6.1    Plaintiff has retained the law firm of Hill Gilstrap, P.C. to represent her in connection with this matter, and has agreed to pay the firm reasonable and necessary attorneys' fees.  In addition to and without waiving and/or limiting any other relief requested in this Complaint, Plaintiff seeks, to the extent permitted by applicable law, including but not limited to 42 U.S.C. § 2000e-5(k), her reasonable attorneys' fees and costs to be incurred herein, in such amount as is equitable and just.

## VII.  JURY DEMAND

7.1    Pursuant to Rule 38, Federal Rules of Civil Procedure, Plaintiff requests trial by jury.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that Defendant be cited to appear and answer, and that, upon final hearing, Plaintiff recover judgment against Defendant for the relief set forth below:

a.    Any and all amounts recoverable and/recognizable as damages and/or nominal damages;

b.    Litigation expenses and costs, including but not limited to her reasonable and necessary attorneys' fees;

c.    Pre-judgment and post-judgment interest, at the maximum rate allowed by law; and

d.    Such other and further relief, whether general or special, at law or in equity, to which Plaintiff may show herself justly entitled.

Respectfully submitted,

*/s/ Frank Hill*
Frank Hill – State Bar No. 09632000
fhill@hillgilstrap.com
Stefanie M. Klein – State Bar No. 11565650
sklein@hillgilstrap.com

**HILL GILSTRAP, P.C.**
1400 West Abram Street
Arlington, Texas 76013
Telephone:    817-261-2222
Facsimile:    817-961-4685
**ATTORNEYS FOR PLAINTIFF**


## CERTIFICATE OF SERVICE

I hereby certify that on September ____, 2024, a true and correct copy of the foregoing document was served on all counsel of record via the ECF system.


*/s/ Stefanie Klein*
Stefanie Klein

# Exhibit A

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Dallas District Office**
207 S. Houston Street, 3rd Floor
Dallas, TX 75202
(800) 669-4000
Website: www.eeoc.gov

Amy Anderton
1400 W Abram Street
Arlington, TX 76013

Re:     Amy Anderton v. Dallas Independent School District
        EEOC Charge Number: 450-2024-02140

Dear Amy Anderton:

The U.S. Equal Employment Opportunity Commission has received your request for a Notice of Right to Sue in the above referenced charge.

Your request has been forwarded to the U.S. Department of Justice (DOJ) for action. That Agency will act on your request and issue the Notice directly to you.

If you have any questions, please call this office at (800) 669-4000.

On Behalf of the Commission:

Shemell D. Perry   Digitally signed by Shemell D. Perry
                   Date: 2024.02.23 14:46:34 -06'00'

For Travis M. Nicholson
District Director

CC:  Frank Hill
     1400 West Abram Street
     Arlington, TX 76013

EXHIBIT A

# Exhibit B

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Dallas District Office**
207 S. Houston Street, 3rd Floor
Dallas, TX 75202
(800) 669-4000
Website: www.eeoc.gov

## DISMISSAL AND NOTICE OF RIGHTS
(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On:  May 7, 2024

**To:** Amy Anderton
1400 W Abram Street
Arlington, TX 76013
Charge No: 450-2024-02140

EEOC Representative and email:    Chandran Newsome
Investigator
Chandran.Newsome@EEOC.Gov

---

### DISMISSAL OF CHARGE

The EEOC has granted your request that the agency issue a Notice of Right to Sue, where it is unlikely that EEOC will be able to complete its investigation within 180 days from the date the charge was filed.

The EEOC is terminating its processing of this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

***Age Discrimination in Employment Act (ADEA):*** *You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, the EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court WITHIN 90 DAYS** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.*

If you file a lawsuit based on this charge, please sign in to the EEOC Public Portal and upload the court complaint to charge 450-2024-02140.

On behalf of the Commission,

*SHEMELL D. PERRY*

For Travis Nicholson
District Director

EXHIBIT B

**Cc:**
Nicole Harron
Dallas Independent School District
9400 North Central Expressway Suite #1675
Dallas, TX 75231

Christian M. Johnsen
1400 West Abram Street
Arlington, TX 76013

Frank Hill
1400 West Abram Street
Arlington, TX 76013


Please retain this notice for your records.

EXHIBIT B

Enclosure with EEOC Notice of Closure and Rights (01/22)

# INFORMATION RELATED TO FILING SUIT
# UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court **under Federal law**. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

### IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* this Notice**. Receipt generally means the date when you (or your representative) opened this email or mail. You should **keep a record of the date you received this notice**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving it (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of this Notice and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

### ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

### HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of this notice, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**To make a FOIA request for your charge file**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method).  You may also submit a FOIA request for your charge file by U.S. Mail by submitting a signed, written request identifying your request as a "FOIA Request" for Charge Number 450-2024-02140 to the

EXHIBIT B

Enclosure with EEOC Notice of Closure and Rights (01/22)

District Director at Travis M. Nicholson, 207 S. Houston Street 3rd Floor, Dallas, TX 75202.

**To make a Section 83 request for your charge file**, submit a signed written request stating it is a "Section 83 Request" for Charge Number 450-2024-02140 to the District Director at Travis M. Nicholson, 207 S. Houston Street 3rd Floor, Dallas, TX 75202.

You may request the charge file up to 90 days after receiving this Notice of Right to Sue. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to
https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.

EXHIBIT B

# Exhibit C

U.S. Department of Justice

Civil Rights Division

NOTICE OF RIGHT TO SUE WITHIN 90 DAYS

VIA EMAIL

*150 M Street, N.E.*
*Karen Ferguson , EMP, 4CON, Room 9.514*
*Washington, DC 20530*

May 07, 2024

Ms. Amy Anderton
c/o Frank Hill, Esquire
Law Offices of Hill & Gilstrap
1400 West Abram Street
Arlington, TX  76013

Re:  EEOC Charge Against Dallas Independent School District, et al.
      No. 450202402140

Dear Ms. Anderton:

   Because you filed the above charge with the Equal Employment Opportunity Commission, and the Commission has determined that it will not be able to investigate and conciliate that charge within 180 days of the date the Commission assumed jurisdiction over the charge and the Department has determined that it will not file any lawsuit(s) based thereon within that time, and because you through your attorney have specifically requested this Notice, you are hereby notified that you have the right to institute a civil action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seq., against the above-named respondent.

   If you choose to commence a civil action, such suit must be filed in the appropriate Court within 90 days of your receipt of this Notice.

   The investigative file pertaining to your case is located in the EEOC Dallas District Office, Dallas, TX.

   This Notice should not be taken to mean that the Department of Justice has made a judgment as to whether or not your case is meritorious.

                                        Sincerely,


                                        Kristen Clarke
                                        Assistant Attorney General
                                        Civil Rights Division


                              by        /s/ Karen L. Ferguson
                                        Karen L. Ferguson
                                        Supervisory Civil Rights Analyst
                                        Employment Litigation Section


cc: Dallas District Office, EEOC
   Dallas Independent School District, et al.

EXHIBIT C